UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,     :
     :
     -against-     :     **<u>MEMORANDUM AND ORDER</u>**
     :     23-cr-223 (DLI)
JOSE ERNESTO RODRIGUEZ TINEO,     :
     :
     Defendant.     :
-------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Defendant Jose Ernesto Rodriguez Tineo ("Defendant") is charged by indictment with conspiracy to import cocaine in violation of 21 U.S.C. § 952(a) and § 960(a)(1); importation of cocaine in violation of 21 U.S.C. § 952(a), § 960(a)(1), and § 960(b)(3); conspiracy to distribute cocaine in violation of 21 U.S.C. § 841(a)(1); and possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(C).  *See*, Indictment, Dkt. Entry No. 6.

Defendant moves to suppress statements and evidence allegedly obtained from his cell phone in violation of the Fourth and Fifth Amendments to the Constitution or, in the alternative, for a hearing.  *See*, Def.'s Mot. to Suppress ("Mot."), Dkt. Entry No. 22.  Defendant appended to the Motion: (1) surveillance video footage of the secondary inspection of Defendant and his property ("Video"); (2) an audio clip of a portion of the conversation during the secondary inspection; (3) the Customs and Border Protection ("CBP") Electronic Media report dated May 3, 2023 ("Electronic Media Report"); and (4) the affidavit by Homeland Security Investigations ("HSI") Special Agent Tiffany A. Rojas ("Agent Rojas") submitted in support of the application for a search warrant to conduct a forensic examination of Defendant's cell phone ("Affidavit").  *See*, Mot. Exs. A-D, respectively.[1]  The Government opposed.  *See*, Gov't.'s Opp'n ("Opp'n"),

---

[1] Exhibits A and B were uploaded to the Court's electronic system.  *See*, Letter, Dec. 18, 2023, Dkt. Entry No. 23.

Dkt. Entry No. 25.  Defendant replied.  *See*, Def.'s Reply ("Reply"), Dkt. Entry No. 26.  For the reasons set forth below, Defendant's motion to suppress is denied in its entirety.

## I.     Background[2]

On April 30, 2023, Defendant traveled on JetBlue Airways Flight 1528 from Puerto Plata, Dominican Republic to John F. Kennedy International Airport ("JFK Airport") in Queens, New York.  Mot. ¶ 8; Opp'n 1.  At the time of his entry into the United States, a CBP alert flagged Defendant as a possible narcotics courier and advised CBP officers at JFK Airport to conduct a secondary border enforcement inspection ("secondary inspection") of Defendant before admitting him into the United States.  Opp'n 2; *See also*, Electronic Media Report at 2 ("Subject was referred to [sic] due to being the subject of Event #[Redacted] suspected of being a possible narcotics courier.").   After Defendant presented his passport in the primary border inspection area at approximately 2:48 P.M., CBP agents referred him to secondary inspection.  Mot. ¶ 8; Opp'n 2.

CBP agents escorted Defendant to the baggage claim area to collect his luggage consisting of one large suitcase, one small suitcase, one backpack, and three duty free bags.  Mot. ¶ 8; Mot. Aff. ¶ 9; Opp'n 2.  Agents then escorted Defendant to the secondary inspection room, which is a large room separated from the baggage claim area by double doors containing multiple inspection tables.  Opp'n 2.  CBP Officer Elena Rivera ("Officer Rivera") asked Defendant to place his bags on one of the inspection tables.  *Id.*  Defendant placed the two suitcases and backpack on the table and initially left the duty free bags on the luggage cart as he answered Officer Rivera's questions.  Another CBP agent then asked Defendant to place the duty free bags on the table.  Defendant complied.  Aff. ¶ 9.

Officer Rivera questioned Defendant in English.  Opp'n 2.  Defendant confirmed that the

---

[2] The facts set forth below either are not in dispute or are set forth in sworn documents made in connection with this case.  Thus, the Court finds a hearing is not necessary to resolve the motion.

bags were his.  Aff. ¶ 9.  Officer Rivera asked Defendant about his trip to the Dominican Republic, and he said that his friend, Christopher, gave him money to pay for the plane ticket and did not require repayment.  *Id.* ¶ 10.  Defendant stated that Christopher was picking him up at JFK Airport that day.  *Id*.  Defendant also described his prior travel to the Dominican Republic, stating specifically that he had gone there for two days in February 2023 for Christopher's birthday celebration, but then changed the story stating it was another friend's birthday.  *Id.* ¶ 11.  He admitted Christopher had paid for that plane ticket as well.  *Id.*  Additionally, Defendant stated that he went to the Dominican Republic in September 2022 to marry his wife and to visit her in November 2022, but he did not visit his wife during the February 2023 trip.  *Id*.

Officer Rivera then asked Defendant for his cell phone passcode at which time he removed his Apple iPhone from his right front pants pocket and, while holding his phone, told her the passcode.  *See*, Mot. ¶ 8; Aff. ¶ 16; Video at 2:55:08-2:55:20.[3]  While Defendant was holding the phone in his hand, another agent, who was inspecting the contents of the bags, held out her hand for Defendant's phone, which Defendant gave to her, and she placed on the table directly in front of him.  Video at 2:55:28-2:55:33.

During this time, two agents inspected the contents of Defendant's luggage, including the duty free bags.  *See generally*, Video.  Defendant had provided agents with his duty free receipt and stated that he had purchased the boxes of cookies, brownies, and chocolate mints at the duty free store in the airport.  *See*, Aff. ¶ 12.  However,  not all of the boxes in the duty free bags were listed on the receipt.  *Id.*  A CBP agent inspected a box from one of the duty free bags and removed a white object from inside it.  Video at 2:58:12.  Further inspection revealed a white powdery substance, whereupon a CBP agent called other agents for assistance and they handcuffed

---

[3] Times listed correspond to the time displayed in the top left corner of the video feed, not the video file time.

Defendant who then was escorted out of the secondary inspection area. Video at 2:58:13-2:59:50. Agents packed the luggage and removed it from the secondary inspection area. *Id.* Approximately ten minutes later, agents conducted a field test of the white powdery substance that indicated the presence of cocaine. Opp'n 5; Aff. ¶ 13. A subsequent analysis of the substance performed by the Drug Enforcement Administration Laboratory confirmed the presence of approximately 4.45 kilograms of cocaine. Opp'n 6; Aff. ¶ 15.

Defendant was placed in a private room wherein he emptied his pockets and was patted down by CBP Officer Cesar Dominguez ("Officer Dominguez"). Opp'n 4. The door of the room was left open "for the majority of the time the defendant was inside." *Id.* The entire time Defendant was in the private room he was restrained physically either with handcuffs on his wrists or a leg restraint connected to his seat. *Id.* at 5.

While in the private room, Defendant gave his iPhone passcode to Officer Dominguez. The Government maintains that Defendant voluntarily handed over the phone "in the powered on and unlocked position and [gave] the passcode" to Officer Dominguez. *See*, Opp'n 5. While not disputing this contention, Defendant asserts that the agent asked for the passcode. *See*, Reply 3. Defendant also made "voluntary and unsolicited statements to CBP officers . . . that he purchased the boxes from the duty-free store, and that the duty-free store should be investigated." Opp'n 5. Both parties agree that Defendant had not received *Miranda* warnings when he made these statements, but he did receive them later from an HSI agent who responded at CBP's request. Mot. ¶ 10; Opp'n 6. The HSI agent provided Defendant *Miranda* warnings in Spanish,[4] since Defendant is bilingual, and formally arrested him. Opp'n 6.

At approximately 3:40 P.M., while Defendant was in the private room and before he

---

[4] It is not clear whether the HSI agent provided the *Miranda* warnings orally or in writing.

received *Miranda* warnings, Officer Dominguez began a "cursory review" of the iPhone that revealed voice notes in Spanish on the WhatsApp messaging application related to Defendant's travel as well as photos of the duty free bags.  Mot. ¶ 9; Opp'n 5-6.  Agents then conducted an "advanced examination" of the iPhone prior to obtaining a warrant.  Mot. ¶ 9; Opp'n 6.

Defendant initially was charged by complaint and arraigned by a magistrate judge of this Court on May 1, 2023.  On May 9, 2023, the Government submitted an application, supported by the sworn affidavit of Agent Rojas, for a search warrant authorizing the forensic examination of Defendant's cell phone contents.  Supporting evidence included, but was not limited to: (1) Defendant's statements to agents regarding his travel and method of payment for plane tickets; (2) the duty free receipt that did not match items in the duty free bags; (3) the cocaine found in the duty free bags; and (4) instructions on Defendant's iPhone about the instant trip and about "swap[ping] out a duty free bag."  *See.* Aff. ¶¶ 10-15, 25.  United States Magistrate Judge Lois Bloom of this Court issued the warrant.  The agents conducted a forensic examination of the iPhone and the Government disclosed its contents to Defendant in discovery.  Mot. ¶ 11; Opp'n 6-7.

## II.     The Motion

Defendant moves to suppress evidence obtained from the iPhone based on alleged violations of the Fourth and Fifth Amendments.  Defendant contends his statement in which he provided his iPhone passcode was compelled, testimonial, and self-incriminating, and was given while he was in custody prior to receiving *Miranda* warnings in violation of the Fifth Amendment.  Mot. ¶¶ 13-16.  Defendant also contends that the "cursory" and "advanced" examinations conducted by the agents prior to obtaining a warrant were not protected by the border search exception to the Fourth Amendment's Warrant Rule and, as such, all evidence found later pursuant to the warrant must be suppressed as the fruit of the original unlawful warrantless searches.  Mot.

¶¶ 17-31.

The Government counters that Defendant was not in custody when he first gave the passcode to the agents prior to receiving *Miranda* warnings and he provided the passcode voluntarily. Opp'n 7-24. The Government also argues that the border search exception obviated the need for a warrant to conduct the initial searches and, in any event, law enforcement officers had reasonable suspicion to search the phone. Opp'n 24-33. Finally, the Government maintains that, even if there were constitutional violations, the evidence from the phone should not be suppressed because there was independent probable cause to support the issuance of the warrant and the agents relied on the warrant in good faith. Opp'n 33-37.

### A.    Fifth Amendment Violation

Defendant contends that he was in custody when he gave his iPhone passcode to CBP agents before receiving *Miranda* warnings. Pursuant to *Miranda v. Arizona*, "the prosecution may not use statements . . . stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). "The ultimate inquiry for determining *Miranda* custody . . . is whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Familetti*, 878 F.3d 53, 60 (2d Cir. 2017) (quotations and citations omitted).

This holistic inquiry takes into account "the nature and context of the questions asked, together with the nature and degree of restraints placed on the" defendant. *United States v. FNU LNU*, 653 F.3d 144, 154 (2d Cir. 2011) (citations omitted). For example, a court should consider, among other things, "the interrogation's duration; its location . . . ; whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and

especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion . . . , and especially so in border situations, the nature of the questions asked." *Id.* at 153. "Determining whether a defendant was 'in custody' involves 'two discrete inquiries . . . first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" *United States v. Badmus*, 325 F.3d 133, 138 (2d Cir. 2003) (quoting *Thompson v. Keohane,* 516 U.S. 99, 112 (1995)) (modification omitted).

Under the circumstances of this case, the Court finds that Defendant was not in custody when he first provided the passcode at approximately 2:55 P.M. while in the secondary inspection area, prior to being placed in handcuffs, and before the discovery of cocaine. He was not in physical restraints during this time. The secondary inspection lasted only approximately ten minutes, far less than other extended and more invasive border inspections that this Circuit has recognized as not custodial. *See*, *e.g.*, *FNU LNU*, 653 F.3d at 155 (finding that the defendant was not in custody when interrogated for over 90 minutes in a private room since officers never drew weapons or placed defendant in physical restraints, and asked questions relevant to his admissibility in the United States). Moreover, the surveillance footage shows that: (1) the encounter was not threatening; (2) Defendant's communications were voluntary and not compelled; and (3) law enforcement agents were not hostile or adverse towards Defendant. In fact, communications between Defendant and the agents appear to have been polite and jovial, such as when a CBP agent asked Defendant if she was opening a container from the large suitcase correctly to avoid "messing it up," followed by the agents' and Defendant's laughter. *See*, Video at 2:50:40-2:50:48. Consequently, as Defendant was not in custody when he provided the passcode in the secondary inspection area, the Court need not address Defendant's claim that

providing the numeric key was a testimonial act under the Fifth Amendment.

However, Defendant's custodial status changed once he was placed in handcuffs. Upon discovering a white powdery substance, the agents immediately placed Defendant in handcuffs and escorted him to a private room in which he remained physically restrained. The Government's claim that Defendant was not in custody in the private room because the door was left open is unavailing. Certainly, the use of handcuffs are not dispositive of custody, as "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010). However, handcuffs and physical restraints are a "hallmark of a formal arrest." *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (finding defendant to have been in custody when placed in handcuffs despite explicitly being told he was not under arrest).

Notably, in the cases cited by the Government, courts found that defendants were not in custody, in part, because they were not placed in physical restraints. *See*, *United States v. Broughton*, 600 F. App'x 780, 783 (2d Cir. 2015); *FNU LNU*, 653 F.3d 144; *Tabbaa v. Chertoff*, 509 F.3d 89, 100 (2d Cir. 2007); *United States v. Gavino*, 2024 WL 85072, at *7 (E.D.N.Y. Jan. 7, 2024); *United States v. Kamaldoss*, 2022 WL 1200776, at *7-8 (E.D.N.Y. Apr. 22, 2022); *United States v. Hassan*, 2019 WL 5684367, at *3 (E.D.N.Y. Nov. 1, 2019); *United States v. Wilson*, 100 F. Supp.3d 268, 278-79 (E.D.N.Y. 2015); *United States v. Tavares*, 2012 WL 194974, at *2 (E.D.N.Y. Jan. 23, 2012); *United States v. Miller*, 2009 WL 2182382, at *10 (E.D.N.Y. July 21, 2009), aff'd, 441 F. App'x 804 (2d Cir. 2011); *United States v. Booth*, 583 F. Supp.3d 545, 552 (S.D.N.Y. 2022). A reasonable person placed in handcuffs after discovery of a white powdery substance, then taken to a private room and physically restrained would believe that s/he was not free to leave. *See*, *Badmus*, 325 F.3d at 138. Agents should have given Defendant *Miranda*

warnings, but they did not do so until later when an HSI agent arrived, the exact time of which is unclear.

In any event, the providing of the passcode by Defendant a second time while in custody is of no consequence because he previously had provided it voluntarily while in a noncustodial setting. Therefore, for the reasons set forth above, Defendant's statement concerning the passcode is admissible.

## B.     Fourth Amendment Violation

Defendant contends that the agents' searches of his phone without a warrant violated the Fourth Amendment, while the Government contends that the searches were lawful under the border search exception. "Neither the Supreme Court nor the Second Circuit has addressed the issue of border searches of electronic devices." *Kamaldoss*, 2022 WL 1200776, at *10 (citation and internal quotation omitted).

The border search doctrine provides that "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). This exception to the Fourth Amendment arises out of the government's "power to protect the Nation by stopping and examining persons entering the country," which makes the Amendment's reasonableness requirement "qualitatively different at the international border than in the interior." *Id.* at 537. "It is well established that the government has broad powers to conduct searches at the border even where . . . there is no reasonable suspicion that the prospective entrant has committed a crime." *Tabbaa*, 509 F.3d at 97-98 (citing Supreme Court cases).

Separate from the border search context, the Supreme Court has held that "[c]ell phones differ in both a quantitative and a qualitative sense," in part, because of their privacy implications

and, thus, law enforcement agents generally must secure a warrant before searching a cell phone. *Riley v. California*, 573 U.S. 373, 386 (2014). The Supreme Court decided *Riley* in the context of a search incident to arrest. However, Defendant asks this Court to follow the Ninth Circuit in extending *Riley* to the border search context. *See*, *United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019).

*Cano* involved a warrantless search of defendant's phone after he was arrested at the United States-Mexico border for attempting to enter the United States with cocaine. 934 F.3d at 1007. The Ninth Circuit held that manual searches of cell phones may be conducted by border officials without reasonable suspicion, but forensic searches require reasonable suspicion. Moreover, any searches of a phone "must be limited in scope to a search for digital contraband," rather than evidence of contraband. *Id.* The court reasoned that warrantless border searches for digital contraband are permissible because "cell phones may ultimately be released into the interior," which, if they contain contraband, the "United States has a strong interest in preventing," but "a warrantless search for evidence of past or future border-related crimes" falls outside the scope of the border search exception. *Id.* at 1014, 1018. The sole and "best example" of digital contraband offered was child pornography. *Id.* at 1014. Defendant also asks the Court to follow a recent decision from the United States District Court for the Southern District of New York that adopted *Cano*'s holding. *See*, *United States v. Smith*, 2023 WL 3358357 (S.D.N.Y. May 11, 2023). The court there also offered child pornography as the only example of digital contraband. This Court is not aware of other examples of digital contraband besides child pornography and none have been offered by the parties.

Neither *Cano* nor *Smith* are controlling precedent, nor are they persuasive, and the Court declines to adopt their holdings. The proposed limitation of the border search exception to digital

contraband is concerning, particularly with respect to the broadness of its application to warrantless searches for future border related crimes.  The *Cano* court apparently did not consider the urgency of curtailing ongoing crimes, such as, for example, international narcotics importation and distribution conspiracies with coconspirators within the United States who will commit crimes within the United States based on the success of the importation of illegal drugs through the border.  The Ninth Circuit's standard would render the border search doctrine virtually toothless with respect to cellular devices, which are now ubiquitous and, thus, frequently used to facilitate criminal activity.  Under *Cano*, law enforcement agents can comb through luggage and notebooks and physical personal effects unhindered, but cellular devices would be off limits no matter what the level of suspicion is that they contain evidence of criminal activity, including continuing criminal activity such as a conspiracy to import cocaine into the United States with the intent to distribute it.  The Court is unwilling to restrain thusly law enforcement's authority and responsibility to police the borders for criminal activity, which is the basis of the border search exception.

The fact that the Supreme Court has acknowledged the unique privacy implications of cellular devices does not mean necessarily that they should be afforded a blanket special protected status, especially when such devices frequently are used to facilitate criminal activity.  It would defy logic to demand that law enforcement agents inspect the borders, but limit the inspection of cellular devices to child pornography only, while evidence of drug or sex trafficking, terrorism, and other serious crimes goes undetected.  The First Circuit acknowledged this logical gap in rejecting *Cano*: "We cannot agree with [the Ninth Circuit's] narrow view of the border search exception because *Cano* fails to appreciate the full range of justifications for the border search exception beyond the prevention of contraband itself entering the country." *Alasaad v. Mayorkas*,

988 F.3d 8, 21 (1st Cir. 2021).  "[T]he border search exception is not limited to searches for contraband itself rather than evidence of contraband or a border-related crime.  Searching for evidence is vital to achieving the border search exception's purposes of controlling 'who and what may enter the country.'"  *Id.* at 20 (quoting *United States v. Ramsey*, 431 U.S. 606, 620 (1977)).

Indeed, the Second Circuit has stated that law enforcement "officers are neither expected nor required to ignore tangible or documentary evidence of a federal crime.  They have the authority to search and review a traveler's documents and other items at the border when they reasonably suspect that the traveler is engaged in criminal activity, even if the crime falls outside the primary scope of their duties." *United States v. Levy*, 803 F.3d 120, 124 (2d Cir. 2015) (finding that there was reasonable suspicion to conduct a warrantless border search of defendant's notebook based on an ongoing investigation of defendant's role in a stock manipulation scheme).  This Circuit is clear that border searches should explore *evidence* of contraband, not just contraband itself.  This Court declines to impose a more restrictive standard.

The Court is sensitive to the privacy concerns at issue.  While this Circuit has not stated what, if any, standard of suspicion is required to conduct a warrantless border search of cellular devices, some courts have discussed the "reasonable suspicion" standard as a possible safeguard.  *See*, *Kamaldoss*, 2022 WL 1200776, at *12 (rejecting *Cano* and noting that "[s]ince *Cano*, no other circuit has held that forensic searches of electronic devices should be limited to searches for digital contraband").  There, the court avoided deciding what level of suspicion was required to search the defendant's laptop at the border without a warrant, but noted that "that standard was clearly met." *Id.* at *9.

Furthermore, while not necessary to decide this motion, the Court posits that some nexus between the search of the cellular device and the goals of the border search exception would be

appropriate. The Fourth Circuit has held that, "to conduct such an intrusive and nonroutine [forensic] search under the border search exception (that is, without a warrant), the Government must have individualized suspicion of an offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband." *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019) (finding that defendant's suspected domestic crimes, related exclusively to domestic sex trafficking, lacked a nexus to the purposes of the border search exception to permit the warrantless searches).

Here, the Court need not determine whether reasonable suspicion or a nexus to the border search exception's purposes are required, for clearly both standards were met. Defendant already had been flagged by the CBP as a possible narcotics courier and CBP agents were advised to conduct a secondary search. *See*, Electronic Media Report at 2; Opp'n 1-2; *See also*, *United States v. Babilonia*, 854 F.3d 163, 178 (2d Cir. 2017) (recognizing the "collective knowledge doctrine" as grounds for a law enforcement officer to conduct a search based "on the assessment or instructions of other officers" who have the relevant information). The agents lawfully conducted a secondary inspection of Defendant and his property upon his reentry into the United States. Agents learned that Defendant's friend, Christopher, had paid for his plane ticket without expectation of repayment, as he had in the past, and that Christopher was picking him up from the airport that day, which would establish reasonable suspicion that Defendant might have communicated with Christopher or others about the illegal activity. *See*, Opp'n 3; Aff. ¶¶ 10-11. Additionally, some of the boxes in Defendant's duty free bags were not listed on his duty free receipt. *See*, Aff. ¶ 12. Agents inspected those boxes and discovered the white powdery substance that turned out to contain over four kilograms of cocaine. This discovery of such a large amount

of cocaine alone was sufficient to establish more than reasonable suspicion, but rather probable cause, to believe that Defendant was engaged in activity related to the importation of and intent to distribute drugs, and a conspiracy related thereto. *See*, Aff. ¶ 13-15. Accordingly, the warrantless searches of Defendant's cell phone fell within the border search exception and the contents of the phone are admissible.

## C.    Suppression as Remedy

Defendant contends that the Court should suppress all evidence found on the phone as a result of Defendant's compelled speech in giving the passcode and the warrantless searches. As discussed above, there were no constitutional violations warranting suppression, but, even if there were, suppression would be improper because there were independent grounds on which to obtain the warrant and the warrant was secured in good faith.

### 1.    Independent Source Doctrine

"The 'independent source' rule permits the admission of evidence seized pursuant to an unlawful search if that evidence would have been obtained through separate, lawful means." *United States v. Vilar*, 729 F.3d 62, 83 (2d Cir. 2013) (citing *Murray v. United States*, 487 U.S. 533, 537 (1988)). This doctrine "applies if, '(1) the warrant was supported by probable cause derived from sources independent of the illegal search; and (2) the decision to seek the warrant was not prompted by information gleaned from the illegal conduct.'" *United States v. Mulholland*, 702 F. App'x 7, 10 (2d Cir. 2017) (summary order) (quoting *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993)) (modifications omitted).

Here, the agents established probable cause for the search warrant based on several factors. Defendant carried a duty free receipt for items that did not match the contents of the bags. Aff. ¶ 12. Defendant made statements about the nature and frequency of his travels, some of which were

inconsistent.  Aff. ¶ 11.  Moreover, Defendant's friend purchased his plane tickets without expecting repayment and was to pick him up at the airport, further raising suspicions.  Aff. ¶¶ 10. Most significant was the discovery before the phone searches of over four kilograms of cocaine in Defendant's luggage that "was not prompted by information gleaned from the [purported] illegal conduct."  *Mulholland*, F. App'x at 10.  This quantity of cocaine, which presumptively is too great for personal use, along with everything else that occurred, established probable cause that evidence related to a conspiracy to import it and/or the intent to distribute it might be found on Defendant's phone.  Accordingly, suppression is not warranted.

### 2.    Good Faith Exception to the Exclusionary Rule

Generally, searches conducted pursuant to a warrant are sufficient to establish that a law enforcement officer "has acted in good faith in conducting the search."  *United States v. Leon*, 468 U.S. 897, 922 (1984).  The presumption of good faith is overcome only when: (1) the issuing magistrate knowingly has been misled; (2) the issuing magistrate wholly abandoned her judicial role; (3) the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) the warrant is so facially deficient that reliance upon it is unreasonable. *United States v. Jones*, 43 F.4th 94, 111 (2d Cir. 2022).

The good faith exception to the exclusionary rule applies here.  There is no evidence that the magistrate judge knowingly was misled or abandoned her judicial role.  As discussed above, there was ample probable cause for the issuance of the warrant.  As such, the application was not so lacking as to render reliance upon it unreasonable.  Finally, the warrant was not so facially deficient that reliance upon it was unreasonable.  "In sum, there was no 'deliberate, reckless, or grossly negligent conduct' or 'recurring or systemic negligence' that the exclusionary rule is meant to deter, and law enforcement's conduct was not sufficiently culpable or deliberate to make

deterrence 'worth the price paid by the justice system.'" *United States v. Dumas*, 2022 WL 678910, at *3 (2d Cir. Mar. 8, 2022) (summary order) (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)).  Accordingly, suppression is not warranted.

## III.    Conclusion

For the foregoing reasons, Defendant's motion to suppress is denied in its entirety.


SO ORDERED.

Dated:  Brooklyn, New York
           June 6, 2024

_____
/s/
DORA L. IRIZARRY
United States District Judge
